## AFFIDAVIT

I, Robert Jacobsen, Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being sworn, depose and state as follows:

## INTRODUCTION

1.      I became a Special Agent with ATF in November 2017. Before becoming a Special Agent, I received fifteen weeks of criminal investigator training at the Federal Law Enforcement Training Center and seventeen weeks of training at the ATF National Academy in Glynco, Georgia. Before I joined ATF, I worked for two and a half years as a Deputy Sheriff with the Loudoun County Sheriff's Office in Loudoun County, Virginia. I began as a patrol officer, responding to calls for service and investigating violations of state criminal law, and later served as a member of the Special Operations Unit, a full-time special weapons and tactics (SWAT) team.

2.      Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers to distribute controlled substances, including those tactics used to avoid detection by law enforcement.  I am familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), fentanyl, heroin, marijuana, and other controlled substances that are, by themselves, illegal to possess.  I am aware of the prices commonly charged on the street for these substances, the methods by which they are packaged for sale, and the jargon used in their trade.  During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

3.    I have participated in various aspects of drug-related investigations.   I have participated in controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have prepared affidavits submitted in both state and federal court in support of applications for criminal complaints, search warrants, tracking warrants, and/or arrest warrants.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.

## PURPOSE OF AFFIDAVIT

4.    I submit this affidavit in support of an application for a criminal complaint charging DASHAWN MATTHEWS, a/k/a "Smoov" (hereinafter, "MATTHEWS") with distribution of cocaine base. As is discussed more fully below, in 2019, agents utilized a cooperating witness ("CW-1") to make a series of controlled purchases of heroin / fentanyl and crack cocaine from MATTHEWS. On June 7, 2019, agents utilized CW-1 and an undercover police officer ("UC") to purchase heroin / fentanyl and crack cocaine from MATTHEWS.

## PROBABLE CAUSE

5.    May 2, 2019. Beginning on May 1, 2019, and continuing on May 2, 2019, agents directed CW-1 to contact MATTHEWS.  In a series of recorded calls, MATTHEWS agreed to sell CW-1 one finger, or ten grams, of heroin / fentanyl.[1] During a call on May 1, 2019, MATTHEWS had checked with his supplier and told CW-1, "I could do the, cause he said he's gonna be doing the finger, so we can do the finger for 6." CW-1 confirmed, "So how much am I paying him," and

---

[1] CW-1 is a long-time ATF confidential human source who has made controlled purchases of evidence in numerous ATF cases. CW-1 has a criminal record that includes convictions for significant crimes of violence as well as an offense involving the possession and distribution of counterfeit money. CW-1 has been paid over $100,000 for its work on this and other investigations. Agents have advised CW-1 that they will take steps necessary to ensure the safety of CW-1.

MATTHEWS responded, "$600." CW-1 called MATTHEWS back and set the meeting up for the next day. CW-1 told MATTHEWS, "As soon as I get the money in my hand I'm gonna call you" and MATTHEWS responded "OK."

6.     On May 2, 2019, MATTHEWS directed CW-1 to meet him in a parking lot near Dudley Street and Vine Street in Roxbury and to call him when he arrived at the meeting location. Once MATTHEWS confirmed that he was ready to sell CW-1 heroin / fentanyl, agents utilized a standard set of procedures whereby they searched CW-1 and CW-1's vehicle for money or contraband with negative results. Agents then equipped CW-1 with a radio transmitter that allowed them to listen in real time to conversations in CW-1's vehicle and equipped CW-1 with an audio-video recording device. Agents provided $600 in official advanced funds ("OAF") to complete the drug sale. Agents surveilled CW-1 to the pre-arranged meeting location on Dudley Street.[2]

7.     Shortly after CW-1 arrived at the meeting location, CW-1 called MATTHEWS. While CW-1 was on the phone with MATTHEWS, agents observed MATTHEWS talking on a cellular telephone as he walked out of the Vine Street Community Center, located a short distance away from the meeting location. MATTHEWS told CW-1 that he had to drop his son off but that he would be back shortly. Agents observed MATTHEWS and another individual get into a black 2008 Nissan Maxima registered to MATTHEWS at 402 Technology Center Drive, Unit 2407, Stoughton, Massachusetts (the "Black Maxima") and drove away. A few minutes later, the Black Maxima returned and parked behind CW-1. MATTHEWS briefly left in the Black Maxima but

---

[2] Agents used these procedures in all of the controlled purchases described below.

3

returned and parked next to CW-1's car. MATTHEWS told CW-1 that he was "waiting for this nigga to pull up . . . my fault . . . this is the man I was telling you about."

8.      After MATTHEWS arrived at the parking lot, a black male wearing a black sweatshirt walked into the Dudley Street parking lot and entered the rear passenger seat of the Black Maxima.   CW-1 observed the passenger reach forward and hand something to MATTHEWS. MATTHEWS then got out of the Black Maxima and entered the front passenger seat of CW-1's car.  CW-1 handed MATTHEWS the $600 in OAF and MATTHEWS handed CW-1 a plastic bag containing a tan powdery substance that, based on my training and experience, appeared to be heroin / fentanyl.  MATTHEWS got out of CW-1's car, re-entered the Black Maxima, and drove off.

9.      CW-1 then left the parking lot.  Agents surveilled CW-1 to a predetermined meeting location. CW-1 handed in the transmitter, recording equipment, and the plastic bag to agents. Agents again searched CW-1 and CW-1's vehicle for money or other contraband with negative results.  Agents field tested the bag which tested positive for the presence of fentanyl.[3]  Agents then debriefed CW-1.  I reviewed the video recording of the meeting between CW-1 and MATTHEWS and I identified the person who handed CW-1 the plastic bag as MATTHEWS.

_____

[3] Agents purchased fentanyl on several occasions from MATTHEWS. Because of the dangers inherent in handling fentanyl, per ATF policy, agents did not field test the contents of the other bags containing suspected fentanyl bags purchased from MATTHEWS. However, I have compared the bags purchased on other dates to the bag purchased on May 2, 2019, which field-tested positive for fentanyl. Based on my observations, I believe that the contents of the other bags are consistent in color and texture with the bag purchased on May 2, 2019. Based on my training and experience and these observations, I believe that MATTHEWS sold CW-1 heroin / fentanyl each time CW-1 ordered it. Significantly, agents conducted field tests each time MATTHEWS sold CW-1 crack cocaine and each time the field test was positive for the presence of cocaine. I do not believe it is likely that MATTHEWS would distribute sham heroin / fentanyl to CW-1 under these circumstances.

10.     May 6, 2019.  After a series of consensually recorded calls, MATTHEWS agreed to sell CW-1 two fingers, or 20 grams, of heroin / fentanyl and 28 grams of cocaine base.  Using the procedures described above, agents searched CW-1 and its vehicle with negative results, provided CW-1 with a transmitter and video recording device, provided CW-1 with $2600 in OAF. Before leaving, MATTHEWS called CW-1 and directed CW-1 to the Only One restaurant on Norfolk Street in Roxbury.  Agents surveilled CW-1 to the meeting location.  CW-1 called MATTHEWS and MATTHEWS told CW-1 that he had just driven past CW-1's car.  Shortly after CW-1 arrived, MATTHEWS arrived in a grey Toyota Corolla.  Agents observed CW-1 follow MATTHEWS through the streets behind the Only One restaurant and park nearby. MATTHEWS entered CW-1's vehicle.  Approximately ten to twenty seconds later, MATTHEWS left CW-1's car and returned to the driver's seat of the grey Toyota Corolla.

11.     Agents followed CW-1 back to a predetermined meeting location.  CW-1 handed in the transmitter, recording equipment, and the plastic bag which contained two smaller plastic bags to agents.  Agents again searched CW-1 and CW-1's vehicle for money or other contraband with negative results.  Agents field tested the bag containing suspected crack cocaine and determined that it tested positive for the presence of cocaine.  Agents debriefed CW-1. CW-1 advised agents that during their short meeting, MATTHEWS placed a plastic bag containing one bag of suspected fentanyl and one bag of suspected crack cocaine in the cup holder of CW-1's vehicle.  CW-1 then handed MATTHEWS $2600 in OAF.

12.     May 9, 2019.  On May 8, 2019, CW-1 arranged to purchase one "finger" or 10 grams of heroin from MATTHEWS in Boston.  In the recorded phone calls setting up the deal, MATTHEWS communicated with CW-1 over two different cellular telephones.  During these conversations, MATTHEWS agreed to meet the CW-1 the next day. On May 9, 2019, CW-1 again

talked to MATTHEWS by phone and MATTHEWS instructed CW-1 to meet at the Only One restaurant.  In a recorded call MATTHEWS told CW-1 he was running a little late.  Approximately 30 minutes later, MATTHEWS called CW-1 and said he was two minutes away. MATTHEWS exited the driver's side door of the Black Maxima and entered the front passenger seat of the CW-1's vehicle. MATTHEWS placed a plastic bag containing a tan substance in the center console of the CW-1's vehicle and CW-1 handed MATTHEWS $600 in OAF.

13.    <u>May 17, 2019</u>.  On May 16, 2019, CW-1 placed a recorded call to MATTHEWS and ordered two fingers of heroin from him. MATTHEWS agreed to meet CW-1 the next day.  On May 17, 2019, at the direction of agents, CW-1 called MATTHEWS and ordered one ounce or 28 grams of crack cocaine in addition to the 20 grams of heroin. While CW-1 was on the way to the meeting location, MATTHEWS called and told CW-1 he would arrive in five minutes.  A short time later, agents observed the Black Maxima cross over Norfolk Avenue and continue onto Milton Avenue. The Black Maxima pulled in behind CW-1's car. MATTHEWS got out of the driver's side door of the Black Maxima and walked over to the passenger side of CW-1's car. MATTHEWS placed a large clear plastic bag in the cup holder of the CW-1's vehicle and CW-1 handed MATTHEWS the $2,600 in OAF.  MATTHEWS got out of CW-1's car, got back into the driver's side door of the Black Maxima, and drove off. Agents conducted a field test of the suspected crack cocaine that yielded a positive result for the presence of cocaine.

14.    <u>May 23, 2019</u>. On or about May 10, 2019, agents had applied for and been granted a search warrant to obtain Global Positioning System ("GPS") data from the Black Maxima. On May 23, 2019, GPS data from the Black Maxima placed the car near 19 Rose Street in Stoughton. Agents established surveillance at that location and observed the Black Maxima. Once agents had established surveillance at 19 Rose Street, agents directed CW-1 to place a consensually recorded

call to MATTHEWS.  During the call, MATTHEWS agreed to sell 14 grams of crack cocaine to CW-1.  MATTHEWS instructed CW-1 to meet MATTHEWS at the same parking lot near Dudley Street and Vine Street where they had met previously. Agents provided CW-1 with $700 in OAF and surveilled CW-1 to the Vine Street parking lot.

15.     As CW-1 proceeded to Vine Street, agents used a combination of physical surveillance and data from the GPS device to follow MATTHEWS to Bell Stoughton Apartments in Stoughton, a gated condominium complex.  Agents observed the Black Maxima parked in front of the building labeled "402" (the street address for this building is 402 Technology Center Drive in Stoughton, which as noted above is where the Black Maxima is registered). At approximately 1:35 p.m., agents observed MATTHEWS exit the door labeled "402." MATTHEWS entered the Black Maxima and drove toward Boston. At approximately 3:25 p.m., agents observed MATTHEWS and the Black Maxima turn on Forest Street and then onto Vine Street.  Agents observed MATTHEWS park the Black Maxima in the lot next to the Vine Street Community center.  At approximately 3:32 p.m., agents observed MATTHEWS walk on Dudley Street, towards the parking lot.

16.     After a short time, MATTHEWS entered the parking lot on foot and approached the passenger side of CW-1's vehicle.  MATTHEWS entered the vehicle and immediately placed a clear plastic bag containing a hard white substance in the center console. CW-1 paid MATTHEWS $700 in OAF.  MATTHEWS got out of CW-1's car and walked back towards Dudley Street. Agents conducted a field test of the suspected crack cocaine which yielded a positive results for the presence of cocaine.

17.     <u>May 30, 2019</u>.  On May 30, 2019, agents directed CW-1 to place a consensually recorded call to MATTHEWS.  During the call, MATTHEWS agreed to sell CW-1 20 grams of

heroin and 14 grams of crack cocaine.  MATTHEWS told CW-1 that MATTHEWS would call his source of supply and agreed to meet CW-1 later that day.  MATTHEWS instructed the CW-1 to meet MATTHEWS on the same parking lot near Dudley Street and Vine Street.

18.     Once at the parking lot, CW-1 placed a phone call to MATTHEWS.  After the phone call with MATTHEWS, a black Honda sedan entered the parking lot.  A black male got out of the Honda with a dog.  The male looked in the direction of the CW-1 and nodded his head, as if to acknowledge the CW-1. A short time later, CW-1 received a phone call from MATTHEWS who told CW-1 to meet him at the Orchard Park housing development.  Agents surveilled CW-1 as CW-1 proceeded to Orchard Park.  Using physical surveillance and data from the GPS device on the Black Maxima, agents tracked MATTHEWS as he drove to meet CW-1. MATTHEWS exited the Black Maxima and entered the passenger side of CW-1's vehicle.  MATTHEWS placed a clear plastic bag containing a tan substance and a clear plastic bag containing a hard white substance in the center console cup holder.  CW-1 paid MATTHEWS the $1,900 in OAF and MATTHEWS got out of CW-1's car. An agent conducted a field test of the suspected crack cocaine that yielded a positive result for the presence of cocaine.

19.     June 7, 2019.  From June 5, 2017 to June 7, 2019, MATTHEWS used two different cellular telephones to communicate with CW-1. CW-1 arranged for another drug customer, who was in reality an undercover police officer (UC), to purchase 20 grams of heroin / fentanyl and 14 grams of crack cocaine from MATTHEWS. On June 7, 2019, the UC was provided with $1,900 in OAF and drove to Milton Avenue in Boston.  CW-1 placed a phone call to MATTHEWS advising him that the UC was on Milton Avenue.  Approximately fifteen minutes later the UC observed a gray Jeep SUV slowly approach and pass the UC vehicle, and park along the curb in front of UC.  The UC observed the Jeep to be occupied by three males, MATTHEWS being in the

rear passenger-side seat.   MATTHEWS exited the rear passenger-side seat and entered the passenger side of the UC's vehicle. Once inside the car, the UC asked MATTHEWS, "You Smoov?" MATTHEWS responded "Yeah."   MATTHEWS placed a clear plastic bag containing two smaller plastic bags in the cup holder in the center console.  The UC then paid MATTHEWS $1,900 in OAF.   Agents conducted a field test of the suspected crack cocaine that tested positive for the presence of cocaine.

20.     I reviewed the video recordings of the controlled purchase. I identified MATTHEWS as the person who entered the UC's front passenger seat and delivered the crack cocaine and heroin / fentanyl to the UC.

## **CONCLUSION**

21.     Based on the information set forth above, I submit that there is probable cause to believe that on June 7, 2019, DASHAWN MATTHEWS distributed cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

I, Robert Jacobsen, having signed this Affidavit under oath as to all assertions contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Robert Jacobsen
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to and subscribed before me this 24th day of February 2020.

The Honorable M. Page Kelley
United States Magistrate Judge



9